28 C.C.P.A.(Patents)

## SHERMAN v. JOHNSON.

### Patent Appeal No. 4419.

Court of Customs and Patent Appeals.
Feb. 3, 1941.

F. Llewellyn Walker, of Dayton, Ohio (Marston Allen, of Cincinnati, Ohio, and Charles Riordon, of Washington, D. C., of counsel), for appellant.

Arthur A. Johnson, pro se, of Bridgeport, Conn. (James T. Kline and George F. Smyth, both of Bridgeport, Conn., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States

Patent Office, which awarded priority of invention defined by the single count of the interference to the appellee Johnson. Johnson, the senior party, copied claim No. 8 of Sherman patent No. 2,071,364 into his application filed January 12, 1929. The application of the Sherman patent was filed April 16, 1930, and the patent issued February 23, 1937.

No testimony was taken by either party, and Sherman, being under order to show cause why judgment on the record should not be entered against him, moved to dissolve the interference on the ground that Johnson could not make the said claim, which corresponds to the sole count here involved.

The Primary Examiner held that Johnson could not make the claim and sustained the motion to dissolve the interference.

Johnson appealed to the Board of Appeals and it reversed the decision of the Primary Examiner and held that Johnson could make the claim. Following this action the Examiner of Interferences resumed the interference proceeding and entered formal judgment on priority in favor of Johnson and against Sherman. From this decision Sherman appealed to the Board of Appeals, which sustained its former decision holding that Johnson could make the claim corresponding to the count, and affirmed the action of the Examiner of Interferences in awarding priority to Johnson. From the latter decision of the board, appeal has been taken to this court and the sole question presented is the right of the senior party Johnson to make the single count in issue which reads as follows: "Manifolding material including superposed strips of record material having transverse weakened division lines upon which the succeeding portions thereof are detachable into separate sheets, and interleaved strips of transfer material also having transverse weakened division lines upon which succeeding portions thereof are detachable into separate sheets, *said strips being disposed with the terminal marginal portions of the detachably connected sheets comprising the strips of one series extending beyond the margins of the detachably connected sheets comprising the strips of the other series to enable the sheets of one series of strips to be collectively grasped independently of those of the other series of strips,* the detachable sheets comprising one series of strips having straight uninterrupted margins on all sides." [Italics ours]

The invention involved relates to manifolding material consisting of layers of record paper strips interleaved with carbon strips, the individual sheets of which may be severed from the strips at transversely placed weakened tear lines. Structure is provided by both parties for facilitating subsequent separation of the record sheets from the carbon sheets after the sheets have been torn from the strips. The strips of manifolding material are called "packs" or "packets" and from them many hundreds of individual sheets may be torn.

Sherman at the terminal margin portion of each of the detachably connected sheets provides a cut-out portion (preferably in the carbon) so that the series of sheets of paper can be grasped by the thumb and finger in such manner as to permit pulling and tearing the paper without, at first, tearing the carbon. It was the aim of Sherman to, in this manner, tear the paper loose along a portion of the perforated lines, and by again grasping the entire body of the pack to complete the paper tearing and also tear the carbon element from the strip. By this procedure, he would leave the paper and the carbon strips, after tearing, "slightly off-set" with a portion of the margins of the carbon projecting beyond the edges of the paper. The left hand could then grasp the carbon and the right hand the paper (at the point where the carbon had been cut out) and in this way facilitate the separation of the carbon paper from the record paper. He also explained that instead of making cutouts in the carbon paper only, a method extensively used was to make notches in opposite edges of both the record sheets and the carbon sheets. This method, he said, was objectionable because it mutilated the record sheets. The claim corresponding with the count at bar evidently was drawn with sufficient breadth to cover making the cutouts in either the record sheets or the carbon sheets.

Johnson was concerned with providing a convenient means of separating the carbon sheets from the record sheets after they had been torn from the long strips or packs as they came from a manifolding machine. He was not primarily concerned in any new method of tearing the sheets from the strip, since this could be done in the ordinary way by grasping the pack and

tearing the sheets off at the dotted lines. At the lower right-hand corner of each undetached sheet, Johnson makes a tab tear line either by making a slit or a dotted tear line extending obliquely from the transverse tear line to the right-hand margin of the strip. In the Johnson structure, when the end sheets of the pack are torn off, the record paper has straight uninterrupted margins on all sides, is rectangular and is not mutilated in any way, while the carbon sheets have an extending tab at the upper right-hand corner and a torn-off or notched portion at the lower right-hand corner. By grasping the projecting carbon sheet tabs in the left hand and the protruding record sheets in the right hand, the carbon sheets and the record sheets may be easily separated.

The answer to the question as to whether or not the involved count reads upon the Johnson disclosure involves the construction which is to be given to the language which, in the above-quoted count, is italicized.

The Primary Examiner, in holding that Johnson could not make the claim corresponding to the count, said in part:

"* * * [Sherman's] structure enables such grasping of record sheets and severance of the strips at any selected set of sheets in the assembly whether or not preceding sets of sheets have been torn off.

"In Johnson, the tear lines are deflected as shown so that there are projecting tabs and truncated corners on each severed set of sheets and of course tabs on the leading set and truncated corners in the trailing set while the sets are connected in strip form, so that if the assembly of strips be reduced to a minimum of two sets of connected sheets to comprise strips, in order to keep within the language of plurals of the first part of the count, the carbons of the first set, but not of both sets, may be grasped independently of the records and the records of the second set, but not of both sets, may be grasped independently of the carbons. [Reference numerals omitted]

"Sherman contends that the count relates to a succession of sheets while in connected relation and is not applicable to a set of single sheets and that the language of the count requires that the terminal margins of the connected sheets comprising the strips of one series; i. e., all the sheets of that series, extend beyond margins of the sheets of the other series as in Sherman's structure so that likewise all of the sheets of one series may be grasped independently of the connected sheets of the other series. Whereas in Johnson's device it is only at the end sets that the sheets of one series may be independently grasped but they are not sheets of the same series.

"It appears clear to the Examiner that the terms of the count must be read as they stand and must be taken together as a whole and so are not fairly readable on the Johnson device, and that the structures of the devices of the parties are different. Whether the contemplated modes of manipulation and operation are different does not appear material under the circumstances."

The Board of Appeals, in its decision upon appeal from the Primary Examiner, in part had the following to say:

"The portion of the count over which the contestants cannot agree reads as follows: "'* * * the terminal marginal portions of the detachably connected sheets comprising the strips of one series extending beyond the margins of the detachably connected sheets comprising the strips of the other series.'

"In the Sherman application the 'marginal portions' referred to here must be interpreted as applying to the front edge of the *whole sheet*. At one side of this marginal portion the sheets of carbon paper are cut away in order that the series of record sheets can be grasped without binding the carbon sheets so that the latter may readily be separated by shaking. In the Johnson structure there are tabs on the front or terminal portion of the transfer sheets which projects beyond the front edges of the record sheets. The part of the count quoted above is broad enough to cover projections either on the record sheets or on the carbon sheets and viewed in this light it is believed that the examiner was wrong in granting Sherman's motion to dissolve." [Italics ours]

In passing on Sherman's request for reconsideration of its decision the board said:

"The party Sherman contends here that the phrase 'to enable the sheets of one series to be collectively grasped independently of those of the other series of strips' means that there are 'grasp escape areas' at the ends of the individual sheets which compose certain strips. We do not find that count 1 is so limited. While it is true

that where claims are copied from a patent the counts shall be construed in the light of the patent, still it is also true that said counts shall be construed as broadly as the language of the counts will permit, provided there is no ambiguity present. It is not contended that there is any uncertainty present in count 1 and when the language is given its plain and ordinary meaning it will read on the Johnson disclosure. We can see no reason for changing our former decision."

The board in its subsequent decision on the question of priority, in which it adhered to its original holding on the right of Johnson to make the claim corresponding to the count, said:

"There does not appear to be anything new brought out in this appeal over what was considered in our former decision. * * *

"Again we must hold that the count is not ambiguous and that when the language used therein is given its plain and ordinary meaning, it will read on the Johnson disclosure."

■ Sherman contends that in determining what is meant by the particular elements of the count here in controversy, resort should be had to the Sherman disclosure and that the meaning he attached to it in his application should be adopted as the meaning for the purpose of deciding the issue at bar. He urges the familiar principle of patent law that where claims are copied from a patent for the purpose of invoking an interference, and construction is necessary, resort shall be had to the specification from which the claim is taken and the meaning of the claim which such application suggests should be controlling.

Where the meaning of the language of the count is in doubt, this, of course, is the well-settled and applicable rule. It is equally well settled that if language is plain and unambiguous and not subject to different interpretations it will be given the broadest meaning which the terminology of the count will permit. If the party has claimed broadly in unambiguous language, he is not thereafter permitted to read limitations, although supported by his disclosure, into the language of the count. The foregoing principles of Patent Office interference practice are so well settled and so generally understood as to require no citation of authority.

In the instant case we are in disagreement with the board with reference to its conclusion that the count is unambiguous. Aside from the spirited contention here between the parties as to the meaning of a portion of the count, we have a situation where the Primary Examiner holds that it means one thing and the board on three occasions has held that it means a wholly different thing. Irrespective of what the count means when applied to the Sherman disclosure, it is our view that the disputed language of the count is meaningless when attempt is made to read it upon the Johnson disclosure.

■ The count refers to superimposed *strips* of record material which we will call paper, and interleaved *strips* of transfer material which we will call carbon. These *strips* are made up of detachable separate *sheets*. The count says "said strips being disposed with the terminal marginal portions of the detachably connected sheets comprising the strips of one series extending beyond the margins of the detachably connected sheets comprising the strips of the other series." It is our view that the words "terminal margin portions" mean the lower end of each of the *undetached* sheets—the end which, when detached, will be that portion which extends farthest from the manifolding machine.

To read this part of the count on Johnson, the terminal margin portion must be the terminal of the *strip* and not the *sheet* because there is no place in the Johnson structure, except at the end of the *strip,* where the paper can be grasped without at the same time grasping the carbon. The count clearly means that the paper, in one form of the invention, and the carbon, in the other form thereof, while in strips, shall, at the dotted margin before being detached, extend in such manner that the paper in one instance, and the carbon in the other, may be grasped without affecting the relative position of the other. The cogency of this view is made apparent by a consideration of the construction which must necessarily be given to the remaining language of the count. The function of this particular structure is stated to be "to enable the sheets of one series of *strips* to be collectively grasped independently of those of the other series of *strips*." It is to be noticed that the count refers to *strips*. Immediately following this the count says "the *detachable sheets* comprising one series of strips having straight uninter-

rupted margins on all sides." (Italics ours) It does not say "the detached sheets." The sheets undetached, defined by the perforated lines and the straight edges on the sides, while in the pack in strip form, have straight uninterrupted margins.

We think that to hold that the count reads upon the Johnson disclosure unduly stretches the language, and that the count, if it became a claim in a patent to Johnson, would be an interloper. See Cleveland Gas Burner & Appliance Co. v. American Heater Corp., 8 Cir., 38 F.2d 760, 763.

When attempt is made to identify the elements of the count with the Johnson disclosure, uncertainty and confusion present themselves, and it is our view that no matter how broadly the count is construed, it does not read on the Johnson disclosure, and in this case we feel very much as we did in one of the early decisions of this court—Slattery v. Larner, 36 F.2d 298, 300, 17 C.C.P.A., Patents, 725. There we said: " * * * It is true that an applicant need not, at the time of filing application, necessarily be conscious of every function which his device can perform in order to claim it, and in interference proceedings 'claims should be given as broad a meaning as their terminology will reasonably permit.' * * * But this principle should not, we think, be stretched so as to apply to a case where there is such manifest difference in structures, specifications, and claims as appears to exist in the instant case."

In passing it may be said that while the respective inventions of the parties relate to manifold material and to a degree overlap as to one of the objects of each invention, it is patent that, in the narrow field of the art involved, the respective inventions essentially relate to different subject matters. In a case of this character it seems to us that there should be an abundance of room for each inventor to operate in his own particular field and that a conclusion like that here reached, based upon what we regard as a reasonable and proper construction of a count, tends to mark the boundaries of the respective inventions and furthers the aims of the patent law system.

We conclude that the Board of Appeals erred in affirming the decision of the Examiner of Interferences awarding priority of invention in the subject matter of the count at bar to the senior party, Arthur A. Johnson, and its decision so doing is reversed.

Reversed.